TRULINCS 44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

---

FROM: 44678039
TO:
SUBJECT: Motion
DATE: 09/09/2015 09:38:00 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

CITY OF DETROIT,
    Intervening Plaintiff,

v.            Case No. 2:11-CV-13101
                 Judge Arthur Tarnow

KWAME KILPATRICK,
    Defendant.


FILED
SEP 15 2015
CLERK'S OFFICE
DETROIT

DEFENDANT'S MOTION IN OPPOSITION TO CITY OF DETROIT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Kwame Kilpatrick (hereinafter referred to as "Defendant"), proceeding through pro se representation in his motion in opposition to the City of Detroit's (hereinafter referred to as "the City") request for summary judgment; and in support thereof states the following:

The Defendant, Kwame Kilpatrick, will challenge the City's contentions. The overwhelming majority of the City's assertions are without merit, and are largely based in egregious misinformation, or unproven rhetoric obtained from governmental narratives used in a previous criminal trial. There are genuine issues of material facts. Therefore, summary judgment is unwarranted in this case at bar.

CONTENTION ONE - On page two, of the City's request for summary judgment, within the section titled "Facts", the City is attempting to intentionally mislead this court, by using misinformation, half-truths, and even outright lies by stating "Kilpatrick and Mercado did not follow the 'usual process', which involves seeking competitive bids and securing City Council approval for a major contract."

REPLY ONE:
The original contract, CS-1368, was completely and absolutely within the direction, control and authority of the Detroit Water and Sewage Department (DWSD). The contract was conceived, designed, engineered, imbued with specifications, and put out for competitive bid by DWSD. The Detroit City Council voted-on, and approved this contract, in or around June of 2002. CS-1368 was awarded by following the "usual process."
Although there was testimony about this contract in the criminal trial, and the varying conversations surrounding it, Inland Waters won this contract by a competitive bid process, and was chosen to perform the particulars of the contract by DWSD. As a matter of fact, contrary to the City's misleading misinformation, the competitive bid process, and the selection of Inland Waters as the winning Contractor, were completed by December of 2001. That is before Defendant was sworn into the office of Mayor, and during a time that he had absolutely no authority, whatsoever, over any City of Detroit, nor DWSD functions, and/or processes. This contract was voted on and approved by the Detroit City Council in or around June 2002 (approximately 6 months after Defendant was sworn into the Mayor's position).
This is the "usual process". Any reference to this contract not following the "usual process" is an untruth, and is a deliberate attempt to mislead the court.

The "usual process" for City of Detroit Contracts, during the time of this particular contract, had no involvement from the Detroit Mayor's Office at all. DWSD assess their own needs, produce specifications for those needs, then they work with the City of Detroit's Law and Purchasing Departments to formalize a contract, and a bid-process for this contract. After taking bids, DWSD employees tabulate the bids based on a number of factors (most of which are in accordance with Federal, State, and Local Laws and Ordinances), then rank the bids from best to worst. After this, a winner is chosen and notified.
The winning bid is then presented to the Detroit City Council for a vote. If any testimony is necessary for the purposes of clarity and understanding of the process, or the contract itself, DWSD employees provide answers to council-member questions, as they are the only individuals who have been involved. The Law and Purchasing Departments will be on standby if they are needed. City Council then votes. If there is an affirmative vote, the winning company sits down with DWSD employees to begin negotiations on terms and particulars; scheduling, budget, performance, etc.
There is no involvement in any part of this process from the Mayor of the City of Detroit, nor anyone from the Mayor's office, at

TRULINCS 44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

---

any time. In regard to CS-1368, much of this process was completed prior to Defendant taking office. There was only the City Council Voting part process that was left to do. Again, that happened 6-months or so after Defendant assumed the office of Mayor. Which is a very reasonable time period between final selection and award, and a City Council vote. This was testified too by DWSD employees in the criminal trial, as well as the presentation of numerous contracts that took much longer to receive a vote after contract award.

There was also a great deal of direct testimony from DWSD employees, who were involved in this contract, stating that they did not receive any communication, directives, or have any discussions at all with the Defendant, nor anyone in his office regarding this contract; CS-1368. There is also no testimony, or any evidence whatsoever, that there was any communication, from the Defendant, or anyone in the Mayor's office, with anyone from the Law and/or Purchasing Departments about this contract; CS-1368.
CS-1368 was completely under the control, direction and authority of DWSD. It was a contract that was awarded by following the "usual process." Most of that process was completed by December 2001 (prior to Defendant taking office as Mayor of Detroit), and the contract was voted-on, and approved by the Detroit City Council.

Not only has the City attempted to mislead, or at the very least, intentionally and deliberately leave out material facts relating to this issue. The City has also deliberately contaminated the rest of the section titled "Facts", with egregious misinformation, and significant misstatements of facts as well. There are genuine issues of material facts within their assertions.

CONTENTION TWO - On page 11-13, of the City's request for summary judgment, within the section titled "Argument", the City continues to mislead the court by stating "The criminal RICO conviction is dispositive of the claim against Kilpatrick."

REPLY TWO:
The jury in the criminal trial gave no indication or information, nor were they directed to do so by the trial judge, regarding which specific acts or contracts they used for their determination of guilt for the purposes of the RICO conspiracy. There are no writings, testimony, or any other evidence anywhere, that CS-1368 or the "Sinkhole Project" were specific acts of contracts used in the determination of guilt, for the purposes of RICO conspiracy.

Although great breadth has been assigned to CS-1368 within the City's argument for Summary Judgment, it continues to be an attempt to mislead the court.
There are 5 separate "change orders" or "new contract activities" under this one contract; CS-1368. These changes substantially changed this contract over its lifespan. It must be noted that all 5 of these very important parts of this contract were very well received by all parties involved in this case; Macomb County, Macomb County Drain Commission, City of Detroit, Contractors, and Sub-Contractors. The work was said to "excellent", and DWSD received accolades and awards for the work on this project, which was done through several contractors and sub-contractors.

The Macomb County Interceptor Project ("The Sinkhole Project"), was an Emergency change to the existing CS-1368 Contract. When the streets suddenly opened up in Macomb County, taking cars, homes, and trees into it, this existing contract was used as a contractual vehicle to pay contractors that were already working on the Emergency job. Contractors were immediately dispatched to the site. This decision was solely under the authority of DWSD. Work began on this project immediately after the collapse, and prior to any formation of any contract, because of the Emergency and Dangerous nature of the job. That response, strategy, and work ethic was lauded by Macomb County Officials, Businesses and Citizens, and was completely under the direction of the DWSD.

Defendant visited the site, on the day after the collapse, conducted a short press conference outlining DWSD's Authority and Command, then returned to Detroit. All responsibility; governmental relations, business relations, public sector relations, media relations, and even citizen relations were completely within the purview, authority and direction of DWSD for the Sinkhole Project.

The Sinkhole Project was formally contracted a few days after the work began, by using a Special Administrator Order from Judge John Feikens of the United States Federal Court. This was done because of the emergency nature of the job. Judge Feikens produced the order, at the request of DWSD, and Defendant's only responsibility was to sign the final order, once presented to him by DWSD. The work had already begun, bills were already being generated, and contractors were already in place for this job. Signing the order did not positively or negatively affect anything related to this job; timing, scheduling, delegation of duties, contractors, sub-contractors, customer support, community relations, or any other thing. DWSD maintained control, and the formality of a contract was now in place for this massive job. There was no interference from Defendant, nor anyone in the Mayor's office in any aspect, part, or procedure relating to the Sinkhole Project. As a matter of fact, there was far more communication and decision-making between DWSD and Macomb County Public Officials than anyone or any entity in Detroit, as it related to this particular job. Every decision made, pertaining to the Sinkhole Project, was made by

TRULINCS 44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

--------------------------------------------------------------------------------

DWSD.

This was proven at trial, through testimony of DWSD employees, as well as Contractors that worked on this particular job. I don't believe, at all, that the jury ever considered this contract as a part of the acts or contracts they used for the guilty verdict for RICO conspiracy. The testimony from DWSD employees asserted that there was no communication, contacts, of discussions held with them by Defendant, or anyone in his office, relating to this contract.

The RICO conspiracy conviction is not dispositive, in any claim against Defendant, as it relates to the specific claims in this Civil Case. There are genuine issues of material facts.

CONTENTION THREE - On pages 14-16, of the City's request for Summary Judgment, within the section titled "Argument", the City alleges "Defendants are collaterally estopped from re-litigating the RICO conviction."

REPLY THREE:
The City is intentionally misleading the court, yet again. The issues of the Sinkhole Project, CS-1368, The Special Administrator Process, were not, in-fact, nor "necessarily", decided in the criminal conviction, nor in Mercado's guilty plea, as it relates to Defendant Kilpatrick.
There were several acts, contracts and circumstances presented to the jury in the criminal trial, for the purposes of determining guilt for the RICO conspiracy charge. There is absolutely no way of knowing which of these were used or even considered, for the purposes of determining guilt. As a matter of fact, there was testimony given by several witnesses during the trial about the emergency nature of the Sinkhole Project. Also how the project received many accolades, awards, and positive comments from State Legislators, Macomb County Commissioners, and even the Macomb County Drain Commissioner. The Special Administrator process was thoroughly explained to the jury, as well as the United States District Court's role therein. The jury understood that the Mayor of Detroit could not produce a federal order, nor force a federal judge to do so.
Many of the contracts presented by the government, for the purposes of a guilty conviction on the RICO conspiracy count had absolutely no relationship to CS-1368, The Sinkhole Project, and some were not even DWSD contracts at all. There is no evidence, testimony, or indication that the jury didn't use a contract involving the Book Cadillac Hotel, or a city Recreational Center for the purposes of determining guilt.

Its not merely a leap for the City to assert that "Defendant Kilpatrick is "collaterally estopped from re-litigating the RICO convictions", as it relates to the specific claims in this civil action, its an intentional attempt to mislead the court by disregarding, ignoring, and leaving out material facts. The continuing assertion that the Defendant's RICO conviction arises out of "the same DWSD contract at issue in the 'parallel' civil case" has no basis in fact, is wrong, and misleading. There are no facts, no evidence, no testimony from DWSD employees, and no information from the jury verdict in the criminal trial that suggest this is true. There are genuine issues of material facts.

TRULINCS 44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

---

FROM: 44678039
TO:
SUBJECT: motion 2
DATE: 09/09/2015 09:40:39 AM

CONTENTION FOUR - On pages 18-20, of the City's request for summary judgment, the City begins its discussion of Damages.

REPLY FOUR:
DWSD was in complete control of the Sinkhole Project. DWSD designed & engineered the scope and all aspects of this job, designated all contractors that were to work on this job, managed and supervised all scheduling, budgeting, and payments for this job. DWSD also assumed the leadership for directly engaged all contractors, subcontractors, public officials, governmental employees, media, and citizens for this job.

There is no testimony in the criminal trial, that there was any interference from the Defendant, or any person working in the Mayor's office, that would have caused a work slow down, work stoppage, work change, or any negative retardation of the process, and/or progress, that was set forth by DWSD, at any time, over the long lifespan of the Sinkhole Project.

There was no testimony or evidence presented of any interference by the Defendant with any bids, cost, scope, budgets, scheduling, equipment, billing, or any other part of the administration or performance of this project.
If there were any problems on this job, of any kind, the Defendant asserts that it would be impossible for them to be related to him at all. This project was completely and absolutely under the direct responsibility, control and authority of DWSD.
The Defendant has no knowledge, nor any involvement with any increased cost or savings. That was not within his span of control or influence, nor is there any evidence that would suggest anything different than Defendant's assertion.
There were no charges, convictions or any testimony related to any bribery, by the Defendant, relating to this contract.
Defendant had personal relationships with several business people within the State of Michigan. Many of these relationships had there beginnings prior to Defendant becoming Mayor of Detroit, and certainly prior to the Sinkhole Project. None of these relationships produced any assertions, charges, convictions, or testimony of bribes, during the criminal trial, as it relates to the Sinkhole Project.
There were no bid-rigging allegations or charges, no money laundering allegations or charges, and no testimony or evidence of any "unnecessary contract, consulting, fees, expenses, and or cost" in the criminal trial, as it relates to this contract.
If any of these things were happening, during the course of this contract, the Defendant asserts that he has no personal knowledge of it at all, and none of it can be attributed to him in any way; by any direct action(s), or by any involvement in operations, oversight, or control, of any part of the contract process, nor any part of the performance of this contract.

DWSD had no problems, hesitations, or mental reservations with accepting the accolades, applause, and awards for their responsibility, control, and authority in the supervising, directing, and performance of the Sinkhole Project. Now, instead of making an argument from their original and sustained position of authority in this contract, they are attempting to absolve themselves from any responsibility relating to this contract. The City is doing this by intentionally attempting to mislead the court, by continuing to present misstatements of fact, deliberately ignoring or disregarding material facts, and even using worn out narratives that the government used during the criminal trial (much of which was proven to be untrue at trial).

There should be no damages that could be attributed or assigned to the Defendant in this case.

TRULINCS 44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

------------------------------------------------------------------------

FROM: 44678039
TO:
SUBJECT: conclusion and prayer
DATE: 09/09/2015 10:00:49 AM

CONCLUSION AND PRAYER

The City (DWSD) has attempted to use the argument that Defendant was guilty of "things" in the criminal trial, and therefore he is guilty of the very specific claims within this civil action. That is an abomination of the truth, the law, and justice.
There were over 300 DWSD contracts that were being performed, supervised, and directed by that department between 2002-2007. Which are the same years of the life span of the single contract that is at issue in this civil action. There were more than 2000 contracts being performed, supervised, and directed by the other 39 City Departments during the very same period. Defendant was Mayor of Detroit during this time, with no role in the "usual" contracting process at all. And only signing the Federal Court Order in the Special Administrator process, which never slowed, stopped, or halted any work or performance of any contract, nor changed any cost or savings of any contract.

The criminal trial asserted that there may have been a RICO conspiracy surrounding 8 of these more than 2300 contracts over this same period of time. And to this day, there is no information, no evidence, no indication, and no facts that suggest that the guilty verdict involved any consideration, at all, of the single contract of this civil action; The Sinkhole Project.
I pray that this Honorable Court will clearly see that there are significant and genuine issues of material facts, and conclude that summary judgment is unwarranted in this case.

***Also, I must state for the record, that I have no access to the discovery from the criminal trial. The facility will not receive the totality of the paperwork (they said it was too large for me to have according to their rules), and the other option of sending the computer disk did not workout either. There is no way for me to view it here at El Reno FCI, as there was not a computer made available for me, in order to view it. I was told by staff and administration "we don't have a computer for inmates to use for that purpose."

Respectfully Submitted,
Kwame M. Kilpatrick
Reg. No. 44678-039
Federal Correctional Institution
P.O. Box 1500
El Reno, Oklahoma 73036

CERTIFICATE OF SERVICE

I hereby certify that on the 9th Day of September, 2015, the foregoing instrument was forwarded to the Court Clerk, located at the Theodore Levin United States Courthouse Building, at 231 West Lafayette Blvd, Detroit, Michigan 48226, via First Class U.S. Pre-Paid Postage.

DECLARATION OF PERJURY

I hereby declare under the penalty of perjury that the foregoing instrument is true and correct to the best of my ability.
28 U.S.C. 1746

Respectfully Submitted,
Kwame M. Kilpatrick

Kwame Kilpatrick 44678-039
Federal Correctional Institution
P.O. Box 1500
El Reno, Oklahoma 73036

OKLAHOMA CITY OK 730
10 SEP 2015 PM 3 L

☞44678-039☜
United States District Ct
Theodore Levin U.S. Court
231 W Lafayette BLVD
Clerk of U.S. Court
Detroit, MI 48226
United States